UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
JERMAINE CELESTER,            )
                              )       CIVIL ACTION
              Plaintiff,      )       No. 21-11523-WGY
                              )
         v.                   )
                              )
MICHAEL RODRIGUEZ,            )
                              )
              Respondent.     )
_____)

YOUNG, D.J.                                October 24, 2023

**MEMORANDUM & ORDER**

Through this petition for a writ of habeas corpus brought
pursuant to 28 U.S.C. § 2254, Jermaine Celester ("Celester")
requests that this Court vacate his conviction for second degree
murder and remand the case to the Massachusetts Superior Court
for further proceedings.  The respondent opposes.  For the
reasons explicated below, this Court denies Celester's petition,
ECF No. 1.

**I.    INTRODUCTION**

   **A.    Procedural History**

Celester's instant petition comes to this Court against the
backdrop of substantial litigation in the Massachusetts courts.

Celester was first indicted on April 19, 1994, on charges
of murder, G.L. c. 265, § 1, and armed assault with intent to
murder, G.L. c. 265, § 18(b).  In 1995, Celester was convicted

by a jury on both counts.  See Respondent's Supplemental Answer ("S.A.") 25-26, 83-84, 362, ECF No. 16.

In 2016, Celester's convictions were vacated after a Superior Court judge allowed his motion for a new trial.  Id. at 291.  In his second trial, Celester was found guilty by a jury of second-degree murder, but was acquitted on the charge of armed assault with intent to murder.  S.A., Ex. 16, Transcript of Jury Trial – Day 15, dated June 12, 2017 ("Tr. 16"), ECF No. 16-16.  Celester was sentenced to life in prison.  S.A., Ex. 17, Transcript Sentencing, dated June 20, 2017 ("Tr. 17"), ECF No. 16-17.

Celester appealed his conviction to the Massachusetts Appeals Court ("Appeals Court").  That court affirmed his conviction and his sentence.  See Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140 N.E.3d 949, review denied, case remanded, 485 Mass. 1106, 150 N.E.3d 1141 (2020).

On March 11, 2020, Celester filed an application for leave to obtain further appellate review with the Supreme Judicial Court ("SJC").  S.A. 544-76.  The SJC denied the application without prejudice and remanded the case back to the Appeals Court for resolution of an issue that had been raised by Celester in his brief to the Appeals Court but had gone unaddressed.  Id. at 733.  The Appeals Court once again affirmed Celester's conviction.  Id. at 730-32.  Celester filed a re-

[2]

application for leave to obtain further appellate review from
the SJC, but this was denied on January 14, 2021.  See
Commonwealth v. Celester, 486 Mass. 1111, 163 N.E.3d 380 (2021).

Celester filed his instant petition for habeas relief on
September 16, 2021.  Pet., ECF No. 1.

### B.   Factual Background[1]

"In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of
a State court, a determination of a factual issue made by a
State court shall be presumed to be correct."  28 U.S.C. §
2254(e)(1).  This memorandum therefore incorporates the factual
findings of the Appeals Court.

In Commonwealth v. Celester, the Appeals Court found the
following facts:

> In February 1994, Wakime Woods was shot, as was
> his friend, Derek Gibbs.  Wakime died of his wounds;
> Gibbs was paralyzed.  Just prior to the shooting,
> Wakime and Gibbs walked shoulder-to-shoulder with the
> defendant down the middle of a street in Brockton.
> Gibbs testified that there were no other persons or
> cars on the street.  Gibbs was in the middle of the
> group with the defendant to his right and Wakime to
> his left.  Suddenly, the defendant stopped short,
> leaving Gibbs's peripheral view.  As Gibbs turned in
> the defendant's direction, he was shot in the right
> side of his face and fell to the ground.  He heard
> more gunshots and Wakime screaming for help.  Marlene

---

[1] EDITORIAL NOTE: The following discussion includes
extensive (perhaps overly extensive) quotation from the
underlying proceedings in the courts of the Commonwealth.  This
is necessary to fairly understand the independent conclusions
this Court has drawn from those proceedings.

Scott, who was sitting in the kitchen of her mother's
house near the scene of the shooting, heard the
gunshots and looked out the window.  She saw a body
lying in the street and ran outside to render aid.
She did not see any people (other than the two
victims) or cars.

The Commonwealth's theory at trial was that the
defendant shot Gibbs because, approximately five
months earlier, Gibbs (along with Calvin Dyous and
Larry Brown) witnessed the shooting of the defendant's
close friend, Robert Moses, but the three had been
unable (or unwilling) to identify the perpetrator.
After Moses's shooting, the defendant repeatedly
questioned Gibbs, Dyous, and Brown.  The defendant was
not satisfied with Gibbs's answers.

Two weeks before Wakime and Gibbs were shot, the
defendant (along with two others whom Gibbs could not
identify) gathered Gibbs, Brown, and Dyous together to
question them again about Moses's murder.  The
defendant was upset and angry; he insisted that the
three witnesses to Moses's murder accompany him to the
police station to identify photographs of the
murderer.  He threatened that if they did not do so,
he would shoot them.  Brown and Gibbs went with the
defendant, but Dyous did not.  Gibbs was unable to
identify anyone at the police station.

The defendant presented a third-party culprit
defense; specifically, he maintained that the
gunshots, which killed Wakime and maimed Gibbs, were
delivered by occupants of a vehicle that drove past
them.  Corrina DeFrancesco, who lived near the site of
the shooting, testified that upon hearing gunshots,
she looked out the window.  Contrary to Scott's and
Gibbs's testimony that there were no cars on the
street, DeFrancesco testified that she saw a small
dark-colored, possibly maroon, car with square
headlights and tinted windows on the road.
DeFrancesco ran outside to investigate and saw the car
fleeing the scene.  She further testified that Wakime
told her that the shots came from the back passenger's
side.

Brockton Police Officer Mark Reardon testified
that after receiving a radio message to be on the
lookout for the described car, he spotted a Ford Tempo
fitting DeFrancesco's description a few blocks away
from the shooting.  After following the car, Reardon
pulled it over.  Two males exited the vehicle and

[4]

fled.  A third occupant got out from the backseat, did
not flee, and was arrested.  DeFrancesco eventually
identified the Ford Tempo as the car she had seen
fleeing after the shooting.  The red Ford Tempo was
searched and no ballistics evidence was found.

Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140 N.E.3d

949, review denied, case remanded, 485 Mass. 1106, 150 N.E.3d

1141 (2020).

## II.  ANALYSIS

### A.  Standard of Review

"In a proceeding instituted by an application for a writ of

habeas corpus by a person in custody pursuant to the judgment of

a State court, a determination of a factual issue made by a

State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence."  28 U.S.C. §

2254(e)(1).

Habeas petitions seeking relief from state court

convictions are reviewed under the highly deferential standard

codified by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996),

which provides:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the
> claim--

(1) resulted in a decision that was contrary
to, or involved an unreasonable application of,
clearly established Federal law, as determined by the
Supreme Court of the United States; or
(2) resulted in a decision that was based on
an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("Section 2254(d)").

"A state court decision is contrary to clearly established federal law if it contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but reaches a different result." Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012) (internal quotation marks and citation omitted). "Clearly established law" refers only to the holdings of Supreme Court decisions and the governing legal principles set forth by the Supreme Court at the time the state court renders its decisions and does not extend to the dicta of Supreme Court decisions. Howes v. Fields, 565 U.S. 499, 505 (2012); Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

The "unreasonable application" branch applies when the state court identified the correct legal principal but applies it unreasonably to the facts in the case at hand. Williams v. Taylor, 529 U.S. 362, 407-08 (2000). A habeas court reviewing this prong must ask if the state court's decision was "objectively unreasonable." Id. at 410. A petitioner meets this standard upon a showing that "the state court's ruling on

the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

An unreasonable determination of the facts occurs when a state court's determination of facts is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Substantial deference is accorded to the state trial court's factual determination under this standard. Brumfield v. Cain, 576 U.S. 305, 314 (2015). Factual determinations are not deemed unreasonable "merely because [the Court] would have reached a different conclusion in the first instance." Id. at 313-14 (citation omitted). Even where "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood v. Allen, 558 U.S. 290, 301 (2010) (quoting Rice v. Collins, 546 U.S. 333, 341-342 (2006)).

These standards apply only to claims that were adjudicated on the merits in State court proceedings. Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007). A claim not adjudicated on the merits is reviewed de novo. Id.

Even if a court finds a breach of Section 2254(d), relief is appropriate only if the error found "had substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 1126 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). "Relevant factors to be considered in determining whether the jury was substantially swayed by the error include: '(1) the extent to which the error permeated the proceeding, (2) the centrality of the issue affected by the error to the case as actually tried, and (3) the relative strength of the properly admitted evidence of guilt.'" Pettiway v. Vose, 100 F.3d 198, 200-01 (1st Cir. 1996) (citing Levasseur v. Pepe, 70 F.3d 187, 193 (1st Cir. 1995)).

**B. The Appeals Court's Decision Rejecting Celester's Claim that the Exclusion of His Third-Party Culprit Defense Violated His Right to Present a Defense Was Reasonable.**

During trial proceedings, on the Commonwealth's motion, the presiding judge precluded Celester from introducing the identity of the individuals in the Ford Tempo that fled the scene and was later stopped by the police. S.A., Ex. 5, Transcript of Jury Trial – Day 4, dated May 25, 2017 ("Tr. 5") 9-12, 23, ECF No. 16-5. Celester argues that due to this exclusion, the jury never heard that "(1) all three knew Derek Gibbs, (2) one disliked Gibbs (motive) (3) two admitted being present at the

scene (opportunity), and (4) two falsely denied being present at
the scene (consciousness of guilt)."  Pet'r's Mem. Supp. Pet.
Writ Habeas Corpus ("Pet'r's Mem.") 23, ECF No. 19.  The jury
also never learned that this evidence corroborated Corrina
DeFrancesco's belief that she saw a similar vehicle flee the
scene of the crime and that Woods had told her that the shots
had come from the backseat passenger side.  Id.  The Appeals
Court affirmed the trial judge's decision.  Celester, 97 Mass.
App. Ct. 1101.  Celester argues that the Appeals Court erred in
doing so, because it did not base its decision on a reasonable
determination of facts and because the Appeals Court applied
established Supreme Court precedent in an unreasonable fashion.

### 1.   Relevant Background Facts

The jury was made aware only of the following facts:  At
the time the crime occurred, DeFrancesco saw a car flee from the
scene of the shooting and later reported this to responding
officers.  S.A., Ex. 10, Transcript of Jury Trial – Day 9, dated
June 2, 2017 ("Tr. 10") 99-108, ECF No. 16-10.  A vehicle
matching the description that she had provided was spotted by an
officer and then stopped.  Two of the occupants of the vehicle
fled and one was arrested.  Id. at 188-204.  DeFrancesco was
brought to the vehicle, a red Ford Tempo, and she identified it
as the same car she had earlier spotted.  Id. at 128-131.

In contrast, these were the facts that Celester sought to introduce in their totality:

When Brockton Police Officer Mather arrived at
the scene of the shooting, he indicated in his police
report that Corrina DeFrancesco "came over to me and
stated that she had seen the M/V leaving the area."
Bates 134.  Mather wrote "She stated to me that it was
a Dk M/V, 4 DR, tinted windows and square headlights.
The M/V was backing up from the scene of the shooting
at a high rate of speed on Green St."  Bates 134.
Officer Kenneth LeGrice wrote in his report that Ms.
DeFrancesco "told me that the vehicle used was a dark
color, possibly an 'Aries'".  Bates 133.  As she told
Detective Gomes later than evening, it was a "box
shaped car.  Dark tinted windows.  She was unsure of
the color because of the poor lighting."  Bates 60.
She made her initial observations when she "was seated
in the kitchen of her home when she heard (4) shots.
She jumped up and looked out her window.  She then saw
a car backing up on Green Street . . . Headlights off.
Bates 60.  She saw the same vehicle again when she
went ran downstairs.  Interview Report with Corrina
DeFrancesco.  She approached a man prone on the street
and believed he was dead.  <u>Id.</u>  She then heard someone
calling "help me" and saw another man in a snowbank.
<u>Id.</u>  When she got over to the injured man he stated
"'it came from the passenger backseat."  <u>Id.</u>  In his
police report, Officer LeGrice wrote that DeFrancesco
told him the car was "the vehicle used" in the
shooting.  Bates 133.  The vehicle information was
"broadcasted" and "given out to the Brockton
cruisers."  Bates 1281.
Brockton police officer Mark Reardon was on
routine patrol less than two miles from the scene of
the shooting when he received a radio transmission
about the shooting and a "description of a Susp
Vehicle Possibly a Mid Size, Dk color, tinted windows,
fled the scene at this time."  Bates 229; Tr. 5:37-38.
Shortly after receiving the alert, Officer Reardon
observed a red Ford Tempo occupied by three black
males approach him from the area of the shooting.  Tr.
5:38, 45.  Reardon first saw the "Susp/Def Veh Pulling
Out of Ash St, Westerly onto Pleasant."  Bates 229.
Reardon observed in his police report that "the timing

would be concurrent with the veh used in the shooting." Bates 229.

The occupants of the vehicle observed Reardon's cruiser and "appeared to be uneasy by my observing them", Tr. 5:38, and "became spooked." Bates 229. The suspect vehicle made several quick turns. Bates 229. Reardon followed the car as it picked up speed and eventually stopped it using his blue lights and siren on Eagle Avenue, roughly one mile from the shooting. Tr. 5:39; Bates 229. Reardon "radioed the info to Control and an officer on scene at the shooting stated a witness observed the veh in question." Bates 229-230.

Reardon wrote in his report that "the veh sped into the parking lot of #25 Eagle Ave." Bates 230. "The veh doors flew open and (3) blk [black] males got out." Bates 230. Reardon ordered them to get back in several times, but the men failed to do so. Bates 230. Reardon wrote in his report that "the (2) passengers fled on foot." Bates 230. Reardon wrote in his report that he arrested the remaining man, identified as Donald Outlar, and charged him with various motor vehicle driving offenses and issued him driving citation. Bates 230; 233. At trial, Reardon testified that the driver and a passenger fled. Tr. 5:39. Moreover, Officer Mather wrote in his police report that Reardon radioed that four black males had been in the car. Bates 59.

Mather drove DeFrancesco to Eagle Avenue to look at the car that Reardon had stopped in order to determine whether it was the car she had observed fleeing the shooting scene. Bates 59; Tr. 3:53; 5:43, 64. DeFrancesco got out of the cruiser and walked around the red Ford Tempo. Tr. 5:66. At first she did not think it was the vehicle, but after observing it further, she identified it as the vehicle that she saw fleeing Green Street. Bates 59. According to an Affidavit for a Search Warrant for the vehicle authored by Trooper William Barrett, "the witness, Corrina DeFrancesco, was brought to the scene and she positively identified the vehicle as the one she had seen earlier backing up from the scene of the shooting." Bates 1281-1282.

Trooper Barrett's Affidavit states that Donald Outlar, the known Tempo occupant arrested by police, "told the above officers [Sgt. Kelliher and Det. Gomes] that he was in the aforementioned vehicle at

the time of the shooting and was in the Glenwood
Street area which is one block east of the shooting
scene." Bates 1282. Despite Officer Reardon's arrest
and citation of Outlar for motor vehicle driving
offenses, "Mr. Outlar also told Sgt. Kelliher and Det.
Gomes that the driver of the vehicle was one Shelton
Terry and the other passenger was one Tommy Woods."
Bates 1282.

Shelton Terry, who later arrived at the police
station to claim the vehicle with its owner, Ruby
Phillips, denied being in the car that night to
police. Bates 1282. Trooper Barrett wrote in his
Affidavit that "Officer Reardon told Lt. Morrill that
Shelton Terry was the driver of the vehicle he had
stopped earlier that evening when he arrested Donald
Outlar." Bates 1282.

Ruby Phillips, the registered owner of the Tempo,
claimed to police that evening that she lent the car
to a man she met at a bar in Boston named Ty
Washington. Bates 1282. In a recent interview,
however, Phillips told the defense investigator that
she lent her car to Shelton Terry, her boyfriend at
the time. Investigation Report of Ruby Phillips.
Contrary to the information in Trooper Barrett's
Affidavit, Ms. Phillips now states that she informed
the Brockton police that she lent her car to Shelton
Terry. Id. Phillips also reported that the Brockton
police knew that she frequently lent her car to Terry.
Id. She claimed that she does not know anyone named
Ty Washington and would not have lent her car to a
strange man she met in a bar. Id. Further, Phillips
stated she went to the police station that night to
retrieve her car with another friend of hers, not
Shelton Terry. Id.

While the police were searching for the occupants
of the Tempo "who fled on foot from a susp veh" police
were "alerted by neighbors on Fitzpatrick Street that
[JD Woods] was observed running thru back yards."
Bates 235. Woods was the brother of the shooting
victim Wakime Woods. According to Officer Reardon's
police report, "the def's clothing description was
similar to that of the susp's and he emerged from the
area of which they had fled." Bates 235. Recently,
Trooper Kevin MacDermott interviewed Woods who denied
any participation in shooting and stated that he was
not in the Ford Tempo. Bates 1503. JD now claims
that his girlfriend called him that night to tell him

that his cousin Tommy (also cousin of the deceased, Wakime Woods) was being chased by the police and that he went outside when he heard sirens to see if the police were chasing Tommy.  Bates 1503.  JD also stated that when the police took him to the police station on the night of February 18, 1994 the police accused him of shooting his brother.  Bates 1503.  JD states he denied involvement, and punched an officer in the face.  Bates 1503.  The Commonwealth reports to the defense that Officers LeGrice, Gomes, and Reardon all deny accusing JD of the shooting; the officers similarly deny that JD punched any officer in the face.  The Commonwealth reports that Officer Reardon in particular recalls being present with JD Woods in the booking area, and that no accusation or assault occurred.

JD also told Trooper MacDermott that he observed his cousin Tommy Woods in the Ford Tempo that night. Bates 1503.  JD stated "that he later spoke to Thomas Woods about why police thought they were involved in the shooting of his brother.  Mr. Woods stated that Thomas had a beef with dudes who lived on Newbury Street, Brockton, MA over a female.  Mr. Woods stated that Thomas wanted to see if it was one of his friends that had been shot or if one of his friends had done the shooting Mr. Woods stated that Thomas left the area and as that was happening, the police began to chase him."  Bates 1503.

The defense has interviewed Thomas Woods, who is serving a life sentence at MCI-Norfolk for a joint venture shooting murder out of Brockton.  See Commonwealth v. Thomas A. Woods, SJC-10793 (2014); see also Investigation Report with Thomas Woods.  Thomas claimed that he was alone in the red Ford Tempo with Donald Outlar; he denied that Shelton Terry was in the car with them, claiming that he only saw Shelton as he was running away from police.  Investigation Report with Thomas Woods.  Thomas indicated he was nowhere near the scene of the shooting that night and did not claim (as JD Woods stated he did) that he went to the scene to see if his friends were the shooters or the victims.  Id.

S.A. 92-97.

### 2.    Relevant Pre-Trial and Trial Proceedings

In pre-trial proceedings, the trial judge informed Celester and the Commonwealth that he would allow Celester to submit third-party culprit evidence related to the vehicle that was spotted fleeing the scene of the crime but would not allow the defense to submit evidence that would require the jury to engage in speculation as to the events inside the vehicle and possible motives that the occupants of the vehicle may have for shooting at Gibbs and Woods.  Id. at 251.

On the day when opening statements were scheduled to begin, Celester filed a motion in limine to present his entire third-party culprit defense in his opening.  Id.  The judge denied Celester's motion, and in doing so, stated:

> I look at the evidence of third-party -- the third-party culprit evidence in this case as it has been explained to me is we have a shooting.  There's evidence that a vehicle is seen leaving the scene of the shooting, backing up with its lights off; unclear whether that vehicle has any involvement in the shooting.  It seems to me just as logical, just as rational an inference, that the people in that vehicle are trying to get away from what they perceive to be a shooting for their own safety than they're fleeing the scene, but I understand that that evidence might be of some use to a jury.  I'm permitting that evidence in. Then there's a question of what vehicle was that. It's described -- I understand [the petitioner] wishes to offer evidence that it was the red Ford Tempo.  I understand that there's a witness who will testify that it was the red Ford Tempo; that's Ms. DeFrancesca -- DeFrancesc -- I'll her get name.
> Ms. DeFrancesco.  However, there's some reason to doubt that because her initial description of the vehicle doesn't necessarily match a red Ford Tempo.

She described it as a four-door tinted windows, square
headlamps, sedan.  I understand the red Ford Tempo was
a two-door.  We'll have to go back and take a look.
My recollection is Tempos were pretty curvy at that
point in time.  But okay, we've got evidence to the
effect that it may have been a red Ford Tempo.  That's
another slightly attenuated aspect of the third-party
culprit evidence.

Then we take it another step further, which is
there's going to be evidence to the effect that the
red Ford Tempo that Ms. DeFrancesco says that she saw
was the red Ford Tempo that was stopped.  That's
unclear.  Ford sold a lot of red Ford Tempos in that
timeframe, but that's another fact where you have to
make some inferences that it's the same vehicle.
Then, as I understand it, the occupants of that
vehicle fled.  It seems to me that that fact may have
some probative value in this case.

Then what I understand is -- what you wish to
offer is evidence regarding who was in the vehicle.
That is not established.  That again, is a further
attenuated step, would require further fact-finding by
the jury as to who was actually in the vehicle.  It
seems to me at that point in time –

And it's my job to draw lines here.  I've
analyzed this and I think that at the point in time
where you begin to try to identify who you say was in
the vehicle, which is something that was not
established at the time, becomes -- first, that just
calls for remote –- It's too remote, too speculative
on the part of a jury.

Second, I don't think that it has at that point
in time substantial probative value.  And I have to
draw the line somewhere.  It seems to me it's logical
to draw it there.

Tr. 5 at 9-12.

At the conclusion of the first day of trial, the defense

made a record of what opening would have been presented had it

been without limitation.  Id. at 224-29.  The trial judge then

reiterated his previous ruling regarding limiting third-party

culprit evidence and restated that the excluded evidence lacked

substantial probative value, would mislead or confuse the jury,

and require the jury to engage in active speculation as to

whether the occupants of the Ford Tempo were actively involved

in the shooting.  Id. at 229.

### 3.   The Appeals Court's Decision

Following Celester's appeal of the trial judge's ruling

pertaining to his third-party culprit defense, the Appeals Court

issued a ruling in affirmation of the trial judge's decision.

The Appeals Court explained:

> "[T]he exclusion of third-party culprit evidence
> is of constitutional dimension and therefore examined
> independently." Commonwealth v. Silva-Santiago, 453
> Mass. 782, 804 n.26 (2009).  However, "[i]n conducting
> an independent examination whether the evidence of the
> alleged third-party culprit's prior conduct was too
> remote in time and too dissimilar, we [do] not . . .
> displace the judge's customary discretion with regard
> to the admission of evidence." Commonwealth v.
> Rosario, 444 Mass. 550, 556-557 (2005).  Thus, the
> Supreme Judicial Court has held that where (as is the
> case here) the judge does not preclude introduction of
> evidence that someone else committed the crime or
> otherwise make any ruling that excluded an entire
> category of third-party culprit evidence, we review
> the judge's assessment that the probative value of
> proffered evidence is outweighed by some
> countervailing prejudicial effect for an abuse of
> discretion.  Id. at 557.
>    Especially in view of the third-party culprit
> evidence that was admitted, see supra, the judge did
> not abuse his discretion in excluding the additional
> proffered evidence.  See Rosario, 444 Mass. at 557.
> As is evident from the summary of the proffered
> evidence set forth in notes 4 to 6, supra, the judge
> acted well within his discretion in finding that the
> additional evidence was too speculative and confusing
> and thus of limited probative value.  See Silva-
> Santiago, 453 Mass. at 801, quoting Commonwealth v.

Rice, 441 Mass. 291, 305 (2004) (third-party culprit
evidence admissible where not too remote or
speculative and will "not tend to prejudice or confuse
the jury, and there are other 'substantial connecting
links' to the crime").  It was not an abuse of
discretion for the judge to conclude, for example,
that the identities of the three (or possibly four)
occupants were, on balance, more confusing and
prejudicial than any marginal value those identities
might add to DeFrancesco's and Reardon's testimony
regarding the Ford Tempo and Wakime's dying
declaration, that their relationships (a brother and a
cousin to Wakime) or earlier sightings of Gibbs in a
barbershop provided little additional value to the
already admitted third-party culprit defense, or that
the alleged consciousness of guilt evidence added
marginal benefit in light of the evidence that the
occupants fled the scene, which was admitted already.

Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140

N.E.3d 949, review denied, case remanded, 485 Mass. 1106,

150 N.E.3d 1141 (2020).

> **4.   The Appeals Court's Affirmation of the Trial
> Judge's Ruling Was Based on a Reasonable
> Determination of Facts and Reasonable Application
> of Supreme Court Precedent.**

Celester argues that the trial judge's ruling was based on

erroneous factual findings and was also based on an unreasonable

application of relevant law.  Celester thus raises issues of

both law and fact.

> **a.   Factual Reasonableness**

"[A] determination of a factual issue made by a State court

shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).

"[T]he term 'facts' refers to 'basic, primary, or historical

facts,' such as witness credibility and recitals of external

events." Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001)).  The presumption of correctness also extends to factual findings that are implicit in the state court's rulings.  See Teti v. Bender, 507 F.3d 50, 58-59 (1st Cir. 2007) ("[I]mplicit credibility determinations . . . are exactly the type of factual determinations to which we defer, at least short of any indication of serious error.").  Celester is thus subject to the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  If Celester fails to do so, then this Court must defer to the state court's findings of fact.  See Torres v. Dennehy, 615 F.3d 1, 5 (1st Cir. 2010).

The first of Celester's reasons supporting his contention that the trial judge made erroneous factual findings that dictated his ruling to exclude third-party culprit evidence is that the trial judge had evidence that delineated the identities of the occupants of the Ford Tempo.  S.A., Ex. 2, Transcript of Jury Trial – Day 1, dated May 22, 2017 ("Tr. 2") 54-59, ECF No. 16-2.  Despite this, the trial judge found that the identities of the occupants of the Ford Tempo were not known and that the jury would have to speculate who they might be.  S.A., Ex. 15, Transcript of Jury Trial – Day 14, dated June 9, 2017 ("Tr. 15") 8-23, ECF No. 16-15.

[18]

While the evidence did establish the identities of one of the occupants of the Ford Tempo (one of them was arrested by a trooper and identified by a trooper), the evidence as to the other occupants was somewhat conflicting and still required speculation.[2]  For instance, one of the individuals suspected to have been an occupant of the vehicle, Shelton Terry, denied having been in the vehicle -- and his statement was corroborated

_____

[2] The Appeals Court noted conflicting evidence as follows:
According to the [petitioner], the identities of the occupants of the vehicle were (i) Donald Outlar, who was arrested by Reardon, (ii) Tommy, whom Outlar and Reardon identified as the passenger who fled and whom J.D. identified as being in the Ford Tempo on the evening of the shooting, (iii) Shelton Terry, whom Outlar identified as the driver, and (iv) possibly J.D., who was arrested after reportedly running through backyards near the area of the fleeing suspects. . . .
Their relationship with the victims were that (i) Outlar and Terry had seen Gibbs at a barbershop earlier in the day, and Outlar stated that the Ford Tempo, which DeFrancesco placed at the scene of the crime and which was detained by Reardon a few blocks from the shooting, had been one block away from the scene earlier, (ii) Tommy was Wakime's cousin and reported in 2017 (just prior to the second trial) that he disliked Gibbs, and (iii) J.D. was Wakime's brother and stated that Tommy told him that he had gone to the scene of the crime after the shooting to check whether his friend was one of the victims. . . .
These discrepancies include (i) shortly before the second trial, Tommy identified Outlar as the driver and denied Terry was in the vehicle, (ii) Outlar identified Terry as the driver, (iii) Terry denied being in the car when he and Ruby Phillips, the registered owner of the vehicle, came to the police station to claim the car, and (iv) Phillips said she had lent the car to Ty Washington, but later denied the same and instead said she had lent the car to Terry.
S.A. 729.

[19]

by Tommy Woods.  Furthermore, on the night of the shooting, there were also questions about the location of the Ford Tempo and whom the vehicle's registered owner had lent it to.  Tr. 2 at 56-57.  The trial judge had this evidence before him and concluded that at the time of the shooting the identities of the occupants of the Ford Tempo were not established.  His conclusion was reasonable, and Celester has not proven otherwise.

Celester then asserts that the trial judge erred in excluding Celester's third-party culprit defense when he placed reliance on the fact that the defense could not establish which of the occupants of the vehicle may have shot the victims.  Tr. 5 at 11-19.  The trial judge reasoned this would require the jury to engage in speculation as to possible motives on the part of the occupants of the vehicle.  Id.  Celester's argument fails because the trial judge's reasoning here cannot be divorced from his concern that the identities of the Ford Tempo's occupants could not be established.  Any line of inquiry about who shot at the victims from the vehicle was linked to the identities of the occupants of the vehicle and would have required the jury to engage in an exercise in speculation as to who was in the vehicle, who might have shot the victims, and why they might have done so.  Quite simply, Celester has not shown that the

trial judge's findings in this regard were clearly erroneous, and therefore Celester's claim in this regard is rejected.

### b.  Reasonable Application of Supreme Court Precedent

Celester also asserts that the Appeals Court's rejection of his claim here constituted an unreasonable application of clearly established Supreme Court precedent governing a defendant's constitutional right to present a complete defense.

"A defendant has a constitutional right to present evidence that another may have committed the crime." Holmes v. South Carolina, 547 U.S. 319, 324 (2006); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). The right to present evidence in one's defense, however, is not unlimited. It "may bow to accommodate other legitimate interests in the criminal trial process." United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)).

State law, when used to justify a limitation of a defendant's presentation of his defense, is only deemed a violation of a defendant's rights if it "infringe[s] upon a weighty interest of the accused" and is "'arbitrary' or 'disproportionate to the purposes [the rule is] designed to

serve.'"  Holmes, 547 U.S. at 324-25 (quoting Scheffer, 523 U.S. at 308).  See Fortini v. Murphy, 257 F.3d 39, 46 (1st Cir. 2001).

Under Supreme Court precedent, the mere fact that Celester was not allowed to present the entirety of his intended defense does not in itself constitute an infringement of his right to present a defense.  The trial judge's exclusion of the specific parts of Celester's third-party culprit defense in question here do not violate Celester's right to put forth a defense.  The trial judge's rationale for excluding specific portions of Celester's defense was rooted in concerns about remoteness, speculation, and marginal probative value.  These are legitimate reasons to limit a defense.  See DiBenedetto v. Hall, 272 F.3d 1, 7-9 (1st Cir. 2001) (trial court did not abuse discretion in excluding third-party culprit evidence where that evidence was speculative and had potential to distract jury).

The trial judge's ruling also does not seem to have infringed a weighty interest of Celester.  Had the trial judge entirely excluded evidence related to Celester's third-party culprit defense, the issue here might be more dire.  The trial judge, however, only restricted the scope of the defense.  Celester was still able to adduce that DeFrancesco saw a vehicle flee the scene of the shooting, that Woods told DeFrancesco that the shots came from the rear of that vehicle, and that two of

[22]

the occupants of the vehicle fled on foot when stopped by
police.  Celester was therefore allowed to present the essential
theory of his intended defense.  Having done so, Celester cannot
argue that the trial judge's limitation on his defense resulted
in a substantial and injurious effect on the ultimate verdict.
In such circumstances, this Court rejects Celester's claim
outright.

     **C.**     **The Appeals Court's Determination that the Prosecutor
Had Not Violated Celester's Constitutional Rights in
His Closing Was Reasonable.**

Celester takes issue with the Commonwealth's closing
statement, in which the prosecutor made factual statements that,
Celester argues, the prosecutor knew, through the course of pre-
trial and trial proceedings, were rebutted by third-party
culprit evidence that the trial judge had excluded.  Pet'r's
Mem. 48.  Celester submits that these statements were a
violation of his Fourteenth Amendment due process rights.  <u>Id.</u>
Celester further submits that the Appeals Court mischaracterized
his argument on appeal.  <u>Id.</u> at 53.

This Court, therefore, assesses whether the Appeals Court's
rejection of Celester's claim constitutes an unreasonable
application of clearly established Supreme Court precedent.

During trial proceedings, the trial judge prohibited the
parties from making mention of the identities of the occupants

of the Ford Tempo, their relationship to the victims, and their possible motives for shooting at the victims.  Tr. 5 at 11-19.

In his closing argument, the prosecutor stated: "there were no cars on Green Street, there were no headlights coming or going on Green Street . . . .  There were no sounds of cars." S.A., Ex. 11, Transcript of Jury Trial – Day 10, dated June 5, 2017 ("Tr. 11") 56-57, ECF No. 16-11.  Later in his closing remarks, the prosecutor, when discussing Corinna DeFrancesco's testimony, stated:

> I'm going to suggest to you that when you go on that effort to find corroboration with other witnesses, with other evidence, Corrina is all by herself with her new account of what she claims to have seen and how she saw the car driving, where she saw the car driving, this what I suggest to you the evidence shows is a fabrication of Wakime Woods trying to say someone in the backseat from the car did the shot. No corroboration.  Zero.  And all evidence to the contrary.  She has no corroboration and she's essentially on an island by herself.  As the finders of fact in this case looking for the truth, I'm going to suggest to you that island is a place you don't want to be and you don't want anything to do with. I'm going to suggest to you that her testimony aside from the two victims' identities and that they were shot out on Green Street should be disregarded in its entirety.

Id. at 75-76.

The defense objected to the prosecutor's closing and the trial judge proceeded to issue a curative instruction.  Id. at 77-86.  The judge provided the jury with the following:

> The last stage of the case that you just heard were closing arguments of the attorneys of both sides.

[24]

It's entirely appropriate for the attorneys to get up
in front of you and to suggest to you what conclusions
they believe you should draw from all the evidence.
Do not, however, forget at the end of the day again
what the attorneys suggest is the evidence that's not
necessarily the evidence.  It's up to you, it's going
to be you, the jury, to determine what the evidence
is, what the facts are in this case.  That's entirely
up to you.

In doing that you need to listen and consider the
evidence submitted by both sides in this matter.  But
again, it's ultimately up to you to determine what the
facts are.  If there's any conflict between what
counsel may have suggested are the facts in this case
and what you recall, remember it's going to be your
recollection that governs.

In addition, one of the things that you're going
to have to decide in this case is credibility of the
witnesses.  We had lots of witnesses at this trial.
The question of the credibility of the witnesses,
that's also up to you to determine.  Again, counsel
can make their suggestions, offer their -- perhaps
their opinions as to credibility of witnesses.  At the
end of the day, that's your call as to which witnesses
you believe and to what extent you believe the
witnesses.

In addition, you're going to need to decide this
case without sympathy, dispassionately.  Your
determinations that you're being called upon to make
in this case have to be made based on logic,
reasoning, common sense, good judgment based upon the
evidence that you heard and the law that I will give
to you shortly when I give you my final instructions.
Again, as I mentioned before, what the Commonwealth
offers or the [petitioner] offers by way of their
closing arguments as to their opinions as to how you
should rule, how you should view the evidence, again
those are their opinions.  It's going to be what you
folks think that governs when you're in jury room
making your determinations and deliberating as a
group.

Id. at 85-86.

Celester maintains that the prosecutor's argument during

his closing that the jury ought reject DeFrancesco's testimony

"in its entirety" because there was "no corroboration" amounted to prosecutorial misconduct, and that the Appeals Court's rejection of his claim constituted an unreasonable application of clearly established Supreme Court precedent.  Pet'r's Mem. 49, 55.

### 1.  The Appeals Court's Reasoning

The Appeals Court's reasoning in rejecting Celester's submission in this regard was as follows:

> A prosecutor's closing argument is improper if it "exploit[s] the absence of evidence that had been excluded at [the prosecutor's] request" (citation omitted).  Commonwealth v. Harris, 443 Mass. 714, 732 (2005).  The [petitioner] first asserts that the prosecutor's statement that "there were no cars on Green Street" was improper.  The testimony of Derek Gibbs, the surviving victim, and Marlene Scott, both of whom testified that there were no cars on Green Street at the time of the shooting, supported this statement.  See Commonwealth v. Lamrini, 392 Mass. 427, 432-433 (1984) (no prosecutorial misconduct if closing remarks grounded in evidence).  Furthermore, the excluded evidence did not place cars on Green Street at the time of the shooting.  Contrast Commonwealth v. Carroll, 439 Mass. 547, 554-556 (2003) (improper exploitation by prosecutor where closing remarks on coventurer's motive "would not have been plausible" had excluded evidence been admitted).  At best, the excluded evidence included J.D. Woods's hearsay statement that Tommy Woods (who was alleged to have been a passenger in a red Ford Tempo identified by Corrina DeFrancesco and pulled over by Brockton Police Officer Mark Reardon) told J.D. that he had gone to the crime scene after the shooting to determine whether one of his friends had been involved.  Similarly, Donald Outlar (who was a passenger in the Tempo when Reardon pulled it over) told police when he was arrested that he had been in the Tempo and one block away from the scene at the time of the shooting. Although the [petitioner]

asserts this evidence contradicted the prosecutor's
statement, he does not explain how.  And, as set forth
above, it is not apparent that it did.  Compare
Harris, 443 Mass. at 730-732 (excluded evidence
included convictions of victim as a "common
nightwalker" and prosecutor stated in closing argument
that there was no evidence that the victim was a
prostitute).

Next, the [petitioner] quarrels with the
prosecutor's statement that DeFrancesco's testimony
should be rejected because there was "[n]o
corroboration.  Zero.  And all evidence [sic] to the
contrary.  [S]he's . . . on an island by herself."
The [petitioner] omits, however, that it is clear that
the prosecutor was referencing DeFrancesco's
uncorroborated testimony regarding the alleged dying
declaration of Wakime Woods, the other victim, that
the shooter was a passenger in the backseat of the car
that DeFrancesco testified drove past the scene of the
shooting. None of the excluded evidence supported
DeFrancesco's testimony regarding the dying
declaration.

Also, the [petitioner] argues that the
prosecutor's statement that DeFrancesco's
"testimony[,] aside from the two victims' identities
and that they were shot out on Green Street[,] should
be disregarded in its entirety."  Again, none of the
excluded testimony contradicts the prosecutor's
argument, which was properly based on evidence
impeaching DeFrancesco, including (as the prosecutor
expressly spelled out just prior to the objected-to
statement) her lengthy criminal record and the
reasonable inference that her testimony regarding
Wakime's dying declaration, unsupported by her
contemporaneous statements to Brockton Police Officer
Manny Gomes, was a recent fabrication.

Finally, the [petitioner] objects to the
prosecutor's statement that "if Corrina saw a car on
Green Street[,] . . . [the red Ford Tempo] was not
it."  The [petitioner] omits the prosecutor's
preceding statement that "the evidence has established
that that red Ford Tempo had nothing to do with the
case" -- a statement grounded in the evidence that
there was a lack of any ballistic evidence in the car
when it was impounded by Reardon.  The [petitioner]
also ignores that the prosecutor's objected-to
statement referred to the impeachment evidence.

[27]

> Specifically, the prosecutor stated, "[I]f Corrina saw
> a car on Green Street[,] saying what she did that
> night -- doing the things that she said to the police
> on . . . [the night of the shooting], if there was a
> car there, that car was not it."  This was supported
> by evidence, including DeFrancesco's contemporaneous
> description of the car she had seen, her initial
> statement to officers that the red Ford Tempo Reardon
> pulled over was not the vehicle she had seen at the
> scene of the shooting, and the fact that her testimony
> at the trial (many years after the shooting) differed
> substantially from her statement to officers the
> evening of the shooting.  None of this was improper
> exploitation of the excluded evidence.  Indeed, the
> prosecutor went on to state: "And even if it was [the
> red Ford Tempo], a car backing up from where bodies
> are in the street, just after shots have rung when
> nothing else of that car is seen by [the] witness, Ms.
> DeFrancesco, that is a distraction."  The excluded
> statements from Outlar and J.D. (that the car was a
> block away and that Tommy had gone to see whether one
> of his friends was involved in the shooting) were not
> inconsistent with the prosecutor's statement.  Our
> decision affirming the [petitioner's] conviction of
> murder in the second degree remains unchanged.

Commonwealth v. Celester, 98 Mass. App. Ct. 1119, 158

N.E.3d 885 (2020), review denied, case remanded, 486 Mass.

1111, 163 N.E.3d 380 (2021).  The Appeals Court also

considered the trial judge's curative instruction to the

jury, "cautioning the jury that closing argument was not

evidence."  Id.

### 2.    The Appeals Court's Decision Was Not Based on an Unreasonable Application of Supreme Court Precedent.

In habeas claims that allege prosecutorial misconduct, the

central question is whether the misconduct renders the trial

[28]

fundamentally unfair.  Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974).  Improper argument by a prosecutor reaches this threshold of fundamental unfairness if it is "so egregious as to create a reasonable probability that the outcome was changed." Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  Strickland v. Washington, 466 U.S. 668, 694 (1984).  Improper remarks made by a prosecutor in closing argument, even where the remarks were "undesirable or . . . universally condemned" are not sufficient, standing alone, to render a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  This standard is only met if the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 181 (quoting Donnelly, 416 U.S. at 643).

Given the generality of the standard articulated in Darden and Donnelly, state courts are afforded "more leeway in reaching outcomes in case-by-case determinations."  Parker v. Matthews, 567 U.S. 37, 48 (2012).  Factors relevant to the Darden analysis may be "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the judge's instruction could have

affected the outcome of the case." <u>United States</u> v. <u>Lowe</u>, 145 F.3d 45, 50 (1st Cir. 1998).

Against the backdrop of the foregoing cases, the Appeals Court's decision does not constitute an unreasonable application of clearly established Supreme Court precedent.  The Appeals Court considered the challenged portions of the prosecutor's closing argument in the context of the entire closing, the trial judge's curative instruction, and the evidence presented at trial.  The Appeals Court's decision, thus, aligns with the factors that are considered under the <u>Darden</u> analysis.  <u>See</u> <u>Lowe</u>, 145 F.3d at 50.  Therefore, Celester has simply not met his burden of proving that the Appeals Court unreasonably applied Supreme Court case law.  Celester's claim is thus rejected.

### D.   The Appeals Court's Decision Affirming the Trial Judge's Ruling Declining to Grant Calvin Dyous Judicial Immunity Was Reasonable.

Celester argues that the trial judge violated his rights to confrontation and due process by making a witness, Calvin Dyous, unavailable to the defense.  Pet'r's Mem. 55.

In Celester's first jury trial, Calvin Dyous testified in favor of the Commonwealth.  Tr. 10 at 37-47.  Dyous was called to the second trial but did not initially appear.  The Appeals Court outlined the following facts in this regard:

[30]

> The Commonwealth issued a trial subpoena to Dyous
> (who had been eluding the Commonwealth's attempts
> to reach him prior to the second trial).  On the
> first day of the second trial, the judge told
> Dyous "to appear at the appropriate time to
> testify in this case.  It will not be today."
> The judge stated that he expected that Dyous
> would be contacted by one of the parties and that
> it was important to respond and actually come
> back to court.  The judge told Dyous that if he
> did not, he would be subject to a warrant.  Dyous
> acknowledged the judge's order.  Nevertheless,
> Dyous did not respond when the Commonwealth
> attempted to reach him.  Despite one-half dozen
> attempts, he was unreachable either through his
> mother or at the cellular telephone number he had
> provided to the Commonwealth specifically for the
> purpose of complying with the judge's order.  The
> prosecutor reported Dyous's failure to respond to
> calls, and the judge issued a bench warrant.  The
> prosecutor assembled a fugitive apprehension team
> to obtain Dyous's presence in court.  The next
> day, Dyous appeared.  He was ordered to wear a
> global positioning system bracelet until he
> testified.  Thereafter, Dyous asked for counsel,
> was appointed an attorney, and raised a Fifth
> Amendment privilege.  After conducting a hearing
> pursuant to [Commonwealth v.] Martin, 423 Mass.
> [496,] 502 [(1996)], the judge agreed that the
> defendant had a valid basis for asserting the
> privilege.

Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140

N.E.3d 949, review denied, case remanded, 485 Mass. 1106,

150 N.E.3d 1141 (2020).

On the fifth day of trial, Celester filed a motion that in

part requested that Dyous be granted judicial immunity.  S.A.

259-60.  Celester argued that the Commonwealth had engaged in

prosecutorial misconduct to make Dyous unavailable.  Id. at 260.

Celester placed reliance on Commonwealth v. Brewer, 472 Mass.

307, 312 (2015), which provides that prosecutorial misconduct arising from the government's deliberate attempt to distort fact-finding processes may permit a judge to grant immunity to a defense witness. Id. Celester was of opinion that if Dyous did testify, he would do so in favor of the defense. Id. at 260-62. For this reason, Celester posited, the prosecutor made deliberate mention of the Fifth Amendment privilege to Dyous's attorney hoping that Dyous would make such a claim (as, in fact, he did). Id. at 262.

On the seventh day of trial, the trial judge declined to grant Dyous judicial immunity, "stating that where he did not find that there was prosecutorial misconduct aimed at distorting the fact-finding process, he did not have the power to grant judicial immunity and, even if he did, he would not in these circumstances because there was a question as to whether Mr. Dyous would testify differently from what he testified to in 1995." Resp't Mem. Opp'n Pet. Writ Habeas Corpus 43, ECF No. 22; S.A., Ex. 9, Transcript of Jury Trial – Day 8, dated June 2, 2017 ("Tr. 9") 6, ECF No. 16-9. When defense counsel persisted, the trial judge stated:

> If there was some evidence, Mr. Grimaldi, that the
> Commonwealth had somehow encouraged Mr. Dyous to
> assert the Fifth, that might be a different animal.
> Then you'd have this prosecutorial misconduct argument
> that doesn't exist in this case. It doesn't exist. I
> see zero, zilch, none, no evidence of that in these
> circumstances. To the contrary, again, what I have

[32]

seen in part because I recognized Mr. Dyous to be
here, I've seen consistent effort on the
Commonwealth's part to ensure that Mr. Dyous was here,
available, ready to testify at trial.  He's the one
that is asserting his right under the Fifth Amendment.
That's not brought about by the Commonwealth.

Tr. 9 at 166.

### 1.    The Appeals Court's Decision

On his appeal to the Appeals Court, Celester argued that
the trial judge violated his constitutional right to compulsory
process, confrontation, and due process by making Dyous
unavailable to the defense.  S.A. 60.  The Appeals Court
rejected this claim.  On the issue of Fifth Amendment privilege,
the Appeals Court declared:

> On this record, the judge did not abuse his
> discretion in finding that, in particular on cross-
> examination, Dyous's testimony could lead to self-
> incrimination.  See G. L. c. 233, § 5; Commonwealth v.
> Delaney, 425 Mass. 587, 596 (1997), cert. denied, 522
> U.S. 1058 (1998), quoting Commonwealth v. Brogan, 415
> Mass. 169, 171 (1993) (where Commonwealth established
> "there was a clear, outstanding order of the court,
> that the defendant knew of that order, and that the
> defendant clearly and intentionally disobeyed that
> order in circumstances in which he was able to obey
> it," witness can be convicted of criminal contempt).
> If, for example, Dyous testified as he did in the
> first trial, the [petitioner] might try to impeach his
> credibility by eliciting testimony regarding Dyous's
> failure to abide by the judge's order, thereby
> exposing Dyous to a potential charge of criminal
> contempt.  If, on the other hand, he testified (as the
> Commonwealth suggested he might) more helpfully to the
> [petitioner] than he had in the first trial, the
> Commonwealth might try to impeach him by eliciting
> testimony that he had been nonresponsive to the
> Commonwealth pretrial, that he had been ordered to
> appear, and that he had failed to respond (at least

[33]

initially).  Such testimony, the judge properly
concluded, might lead to a link in the chain towards
criminal contempt.

The [petitioner], nonetheless, maintains that
Dyous lacked the required intent for criminal contempt
because he did not intend to thwart the administration
of justice and received insufficient warnings that his
failure to comply with the order would expose him to
criminal consequences.  However, Dyous's failure to
respond (despite numerous attempts to garner his
cooperation) in violation of the judge's order to do
so could be a basis to infer the requisite intent
(even if Dyous changed his mind and ultimately
conformed his conduct to the judge's order once the
bench warrant issued).  See Furtado v. Furtado, 380
Mass. 137, 141 (1980), quoting Blankenburg v.
Commonwealth, 260 Mass. 369, 373 (1927) (charge of
criminal contempt "is designed wholly to punish an
attempt to prevent the course of justice").  Moreover,
the judge expressly told Dyous that his failure to
respond when called could subject him to a warrant.
Contrast Commonwealth v. Carr, 38 Mass. App. Ct. 179,
181 (1995) (contempt improper where "defendants were
neither told of the significance of being recognized
as a witness nor warned of the consequences of failure
to appear").  Because a valid Fifth Amendment
privilege exists where there is a possibility of
prosecution for criminal contempt even if conviction
is unlikely, the judge did not abuse his discretion.
See Commonwealth v. Borans, 388 Mass. 453, 459 (1983),
quoting Turner v. Fair, 476 F. Supp. 874, 880 (D.
Mass. 1979) ("neither a practical unlikelihood of
prosecution nor the prosecutor's denial of an
intention to prosecute negates an otherwise proper
invocation of the Fifth Amendment").

Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140

N.E.3d 949, review denied, case remanded, 485 Mass. 1106,

150 N.E.3d 1141 (2020).

On the issue of judicial immunity, the Appeals Court

declared:

> The [petitioner] contends that the judge should have
> granted judicial immunity to Dyous on the ground of
> prosecutorial misconduct.  See Commonwealth v. Brewer,
> 472 Mass. 307, 312 (2015), quoting Commonwealth v.
> Vacher, 469 Mass. 425, 439 (2014) (leaving open
> possibility that judge may grant immunity to defense
> witness where government has engaged in "deliberate
> intent to distort the fact-finding process").  The
> judge, however, found no prosecutorial misconduct -- a
> finding that is not clearly erroneous on the record
> before us.  See Commonwealth v. Valentin, 91 Mass.
> App. Ct. 515, 522 (2017) (proper denial of immunity
> where records failed to show prosecutorial misconduct
> and proffered testimony "relates only to the
> credibility of the government's witnesses").

Id.

### 2.   Deferential Review Under Section 2254(d) Is Apposite.

Although Celester requests de novo review, Pet'r's Mem. 63,

such review is not appropriate here.  "When a federal claim has

been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the

claim on the merits in the absence of any indication or state-

law procedural principles to the contrary."  Harrington, 562

U.S. at 101-02.  The presumption may be cast aside only when

"the evidence leads very clearly to the conclusion that a

federal claim was inadvertently overlooked in state court . . .

."  Johnson v. Williams, 568 U.S. 289, 303 (2013); cf. Neal v.

Puckett, 286 F.3d 230, 235 (5th Cir. 2002) ("In the context of

federal habeas proceedings, adjudication 'on the merits' is a

term of art that refers to whether a court's disposition of the
case was substantive as opposed to procedural.").

The Appeals Court addressed Celester's claims on
substantive grounds -- this is evident on a plain reading of the
Appeals Court's reasoning.  Although Celester argues that the
Appeals Court did not engage in the manner of comprehensive
analyses and fact finding that he believes was merited, the
trigger for the deferential standard under 28 U.S.C. § 2254(d)
is simply the mere adjudication of an issue.  See Junta v.
Thompson, 615 F.3d 67, 71 (1st Cir. 2010) (quoting Rashad v.
Walsh, 300 F.3d 27, 45 (1st Cir. 2002)) (adjudication inquiry
"is not whether the state court opinion engaged in the
comprehensive analysis typically required of 'a law school
examination,' but whether the substance of [the petitioner's]
federal claims was addressed"); Clements v. Clarke, 592 F.3d 45,
55 (1st Cir. 2010) ("[Section 2254(d)'s] trigger for deferential
review is adjudication, not explanation.").

> ### 3.   The Appeals Court's Decision Was Based on a Reasonable Determination of Facts and Reasonable Application of Law.

Following the prosecutor's conversation with Dyous's
attorney, the prosecutor, addressing the trial judge, explained:

> Yesterday at the lunch break, Judge, you had
> indicated that you were going to address the issue of
> the Fifth Amendment Privilege with this particular
> witness, Mr. Dyous, and his counsel, Attorney Wood,
> Joshua Wood.  At the end of the lunch break close to

two o'clock, I came into the courtroom.  I saw Mr.
Wood, Attorney Wood, Mr. Dyous' counsel, and we know
each other from having cases together in this court
and from the legal community, and I walked over and he
indicated to me that he did not see any Fifth
Amendment Privilege because everything happened back
in 1993 and 1994.  I then stated to him that I agree
with that and that the only possible issue that I
could see is a possible criminal contempt for failure
to come to court and answer to the warrant or the
summons, rather, that Your Honor ordered to stay in
contact with us, resulting in the bench warrant
issued.  So I let counsel know that.  I wasn't saying
that we were going to pursue that and that in my
experience our office only pursue those situations in
extreme situations but I was candid with him and I
said that's the only issue that I could possibly see
as a basis for a Fifth.  I just wanted to put that on
record that we had that conversation and counsel
indicated that he was -- He left the courtroom after
that.  So I wanted that to be clear on the record.

S.A., Ex. 8, Transcript of Jury Trial – Day 7, dated May

31, 2017 ("Tr. 8") 147-48, ECF No. 16-8.

The prosecutor's conversation does not reveal any

conspiracy on the part of the Commonwealth.  At best, drawing

all inferences in favor of Celester, it would still require a

significant conclusory leap to find that the prosecution engaged

in misconduct through its conversation with Dyous's attorney.

This Court thus defers to the findings of fact of both the trial

judge and Appeals Court in that no evidence of prosecutorial

misconduct existed.

Although Celester does not explicitly argue that the

Appeals Court's application of the law to this issue was

unreasonable -- logically so because, while there may, to a

minimal extent, be a mixed question of law and fact here, this
matter is still largely a factual inquiry -- it should be noted
that there does not appear to be any Supreme Court precedent
that vests a defendant with a right to judicial immunity if that
defendant asserts his Fifth Amendment privilege and becomes
unavailable to testify.  Indeed, Celester does not cite anything
to this effect.  For this reason, it simply cannot be held that
the Appeals Court unreasonably applied clearly established
Supreme Court law.  Presuming, for the sake of argument, such
law existed, Celester still bears the burden of proving that the
trial judge's decision here had a substantial and injurious
effect on the verdict.  Even were Dyous to testify in favor of
the defense, he had testified in favor of the prosecution in the
first trial, and thus the prosecution could have used his prior
testimony both substantively and for impeachment purposes.
Mass. R. Evid. 613; see also William G. Young, John Pollets &
Christopher Poreda, Massachusetts Evidence 342 (2022-2023 ed.).
There was, therefore, no substantial or injurious effect on the
verdict.

>    **E.   The Appeals Court's Decision Affirming that the
>          Prosecutor Did Not Violate Celester's Constitutional
>          Right to Due Process in His Closing Was Reasonable.**

Celester alleges that the prosecutor violated his
constitutional right to due process by stating in his closing

argument, contrary to the evidence and a court order, that Gibbs

had identified Celester as the shooter.  Pet'r's Mem. 64.

The relevant portion of the prosecutor's closing with which

Celester takes issue is as follows:

> Now, Derek Gibbs acknowledges, what I suggest to you
> in a credible way, he did not complete that turn when
> he noticed as he turned to his right, seeking to turn
> around and see where Celester was but he told you that
> it was this man and together with the words of Wakime
> Woods, the identity of that shooter is unequivocal.
> And skilled counsel can't talk it away.

Tr. 11 at 54.

The Appeals Court, in addressing and ultimately rejecting

Celester's argument, provided:

> The [petitioner] argues that the prosecutor's phrase
> in his closing argument, "but [Gibbs] told you that it
> was this man," was improper in light of the allowance
> of the [petitioner's] motion to exclude Gibbs from
> identifying the defendant as his shooter.  We view the
> prosecutor's remarks in light of the "entire closing
> argument, the judge's instructions to the jury, and
> the evidence produced at trial."  Commonwealth v.
> Lyons, 426 Mass. 466, 471 (1998).  In the closing,
> which spanned twenty-seven pages of transcript, the
> prosecutor reminded the jury multiple times that Gibbs
> did not complete the turn to see the [petitioner]
> shoot him.  When viewed in context, there was no
> error.  See Commonwealth v. Whitman, 453 Mass. 331,
> 345 (2009).

Commonwealth v. Celester, 97 Mass. App. Ct. 1101, 140

N.E.3d 949, review denied, case remanded, 485 Mass. 1106,

150 N.E.3d 1141 (2020).

Celester requests that this Court review his claim de novo

and not under the Section 2254(d) standard because the

resolution of his claim was conclusory and involved a mixed question of law and fact.  Pet'r's Mem. 64-66.  This Court may only do so when there is evidence that shows that Celester's claim was either resolved on procedural grounds or that a federal issue was overlooked, and the claim was otherwise not resolved on the merits.  See Harrington, 562 U.S. at 101-02. There is no evidence to sustain these assertions, and therefore, the deferential standard under Section 2254(d) applies.

The Appeals Court's decision rejecting Celester's claim here was based on a reasonable determination of facts.  The Appeals Court reviewed the prosecutor's statement in the context of the entirety of the closing and noted that the prosecutor reminded the jury multiple times that Gibbs did not complete the turn to see Celester shooting him.  This is clear, both as a factual matter as well as matter of law.

## III. CONCLUSION

Celester has not met his burden of proving that the Appeals Court's decision pertaining to any of his current claims involved an unreasonable application of Supreme Court precedent or was based on an unreasonable determination of facts. Moreover, even had any of Celester's arguments passed muster, any error there from had no substantial and injurious effect or influence on the jury's verdict.  For these reasons, Celester's petition for a writ of habeas corpus, ECF No. 1, is **DENIED**.

[40]

**SO ORDERED.**

                                              /s/William G. Young
                                             WILLIAM G. YOUNG
                                                 JUDGE
                                                 of the
                                             UNITED STATES[3]

---

[3] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.